IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


UNITED STATES OF AMERICA

CRIMINAL CASE NO.

v.                                          1:10-CR-0102-TCB-JFK

DOMINIC SMITH,

                Defendant.


## REPORT AND RECOMMENDATION

Defendant Dominic Smith contends that he is incompetent to stand trial. On January 6, 2011, Defendant's counsel orally sought a psychiatric examination of Defendant, and the District Court granted that request. [Doc. 112]. On May 17, 2011, the Government sought a separate psychiatric examination of Defendant which was granted. [Doc. 125]. After the reports of examination were received by the court, a competency hearing was held on September 8, 2011.[1] [Doc. 133]. Following the hearing, Defendant filed a brief in support of his contention that he is incompetent to stand trial. [Doc. 134]. And the Government responded arguing that Defendant is competent to stand trial. [Doc. 136].

---

[1]Citations to the transcript of that hearing are: (Tr. at ).

## I. Evidence Presented at Competency Hearing

At the competency hearing, Defendant called Smitha Bhandari as an expert witness in forensic psychiatry. Dr. Bhandari has a 2004 medical degree from the University of Michigan Medical School. In 2007, she completed her adult residency training at Emory University; in 2009, she completed her fellowship training in child and adolescence psychiatry at Emory University; and in 2010, she completed her forensic fellowship in psychiatry at Emory University. In June 2011, Dr. Bhandari became board certified in adult and forensic psychiatry. (Tr. at 5-6; Def. Ex. 2). As part of her fellowship in forensic psychiatry, she performed competency evaluations in Fulton County and worked at Georgia Regional with patients to restore competency to stand trial. (Tr. at 6). She has performed between one-hundred fifty and two-hundred competency examinations. (Tr. at 7). And she has been qualified as an expert witness on approximately seven occasions in the Superior Courts of Clayton, Fulton and DeKalb Counties. (Tr. at 6-7).

Dr. Bhandari explained that she conducts competency examinations by using a "semi-structured" interview asking a variety of questions to determine a defendant's legal knowledge and ability to assist his or her attorney. (Tr. at 8). She also attempts to obtain social and medical history, as well as speak with others to obtain as much

2

information as possible. (Tr. at 8-9). In this case, Dr. Bhandari met with Defendant, who was on bond, at her office on two occasions, March 18, 2011, and April 8, 2011. (Tr. at 10, 19-20; Def. Ex. 1). The first session was an one-on-one interview with Defendant Smith that lasted from two and one-half to three hours. (Tr. at 10). At that time, she was in possession of defense counsel's legal file concerning Defendant, and afterwards, she spoke with Defendant's mother and grandmother, but they were not able to provide her any specific information. (Tr. at 11, 22-24, 33-34).

She learned, although she could not obtain any records to verify the information, that Defendant was hospitalized for some period of time at age 7 at the Georgia Mental Health Institute, that Defendant was in special education classes in school, that Defendant completed high school and took some college classes, and that Defendant had been, during his childhood on some medications, such as, maybe, Ritalin. (Tr. at 11; Def. Ex. 1). With respect to the March interview, Dr. Bhandari generally described Defendant as a "difficult interview," "disinhibited," "asking a lot of inappropriate questions," non-responsive, and "distracted." (Tr. at 12-13).

She found that Defendant had a basic understanding of the charges filed against him[2] and of the court proceedings (Tr. at 14, 29-30) but that his "paranoia," "distractibility," and "grandiose delusions" were barriers to him understanding the possible consequences of the proceedings and of assisting his attorney (Tr. at 13-18). She testified that Defendant reported to her that he did not believe that he would go to jail even if convicted because of the famous people that he knew, such as artists and government officials, who would assist him and that he was "fixated on wanting to protest his innocence." (Tr. at 13-15). Defendant also reported to her that he did not believe that he could obtain a fair trial in Atlanta due to racial prejudice against him and that, for the same reason, having a black attorney representing him would be prejudicial to him. (Tr. at 15). Dr. Bhandari also testified that Defendant was suspicious of his attorney and believed that he was working with the Government against him. (Tr. at 15).

Because she found that Defendant's beliefs or fears on these matters "are little bit more fixed than most people's fears" and because he would not listen to

---

[2]Defendant is charged with conspiring with two other individuals, during the time frame of October 8, 2007, to November 8, 2008, to make false and material declarations to a Federal Firearms Licensee regarding the true identity of the purchaser of various firearms. [Doc. 1].

4

explanations about these concerns "because he was so fixed in his beliefs that he's rigid," along with being distracted, having grandiose delusions about friends, and being paranoid about racial prejudice and his attorney, she concluded that these traits "would seriously impact his ability to work with his attorney on his various options" and would "impede his ability to rationally discuss his options[.]" (Tr. at 16-18). She was also concerned that Defendant's distractibility could make his appearances in court difficult stating that she "[didn't] know how well" he could observe and understand or if he would engage in inappropriate behavior. (Tr. at 18-19).

At the second session on April 8, 2011, Dr. Bhandari stated that she observed the same conduct and characteristics, including while Defendant was unaware that he was being observed, indicating to her that Defendant was not faking or malingering.[3] (Tr. at 19-22). She also reported that Defendant was given the "simple" MMPI true and false test which he was too distracted to complete. (Tr. at 19-21).

Based on all of her observations and the examination, Dr. Bhandari concluded: "In my opinion the factors that I discussed were all barriers to his ability to assist his

---

[3]Dr. Bhandari testified that she spent a total of four hours with Defendant and that her staff spent ninety minutes. (Tr. at 22). In her report, Defendant Bhandari indicated that the initial interview lasted approximately four hours and that the second interview was spent in the administration of the MMPI which lasted approximately ninety minutes. (Def. Ex. 1).

AO 72A
(Rev.8/82)

defense. I felt like the delusions, the distractibility, the disinhibition, his fixation on certain ideas, were defects that made it difficult for him to be able to assist his attorney and to participate in his defense." (Tr. at 24). And, in her report, she concluded that "to a reasonable degree of medical certainty, at the time of the evaluation, Mr. Smith was not competent to stand trial." (Def. Ex. 1).

On cross-examination, Dr. Bhandari agreed that based on her observations of Defendant, his cognitive function was "average for his age group," that is, early twenties. (Tr. at 26-27). Also, she stated that Defendant was cooperative during the interview and would answer questions with "some redirection" but that he was "very distracted." (Tr. at 27-28). She agreed that her competency determination focused on her opinion regarding Defendant's inability to assist his attorney due to distraction, fixation, difficulty in answering questions, paranoia and grandiosity. (Tr. at 28). In response to a question about Defendant having some anxiety about the outcome of the case, Dr. Bhandair, responded that "he does and he doesn't[.]" (Tr. at 30). She believes that Defendant's conduct is not volitional. (Tr. at 31). Dr. Bhandari did not diagnose Defendant with a mental illness, due in large part to the lack of mental health history, but stated that he exhibited "symptoms of psychosis, he has symptoms of

disinhibition and distractibility" and of rigid-inflexible thinking. (Tr. at 31-35, 37).

All of which were a "barrier to competence." (Tr. at 36).

The Government also called an expert witness in forensic psychiatry, Michael Hilton. (Tr. at 39-40). Dr. Hilton has been in private practice for twenty-one years with approximately half of his practice involving forensic psychiatry, and he is currently on staff at the Shepherd Center, in Atlanta. (Tr. at 40; Gov't Ex. A). He graduated from the University of Alabama in Birmingham School of Medicine in 1984, followed by completing a residency in psychiatry at Johns Hopkins University and Hospital, in Baltimore, in 1989, and then a fellowship in forensic psychiatry at the University of Maryland in 1990. (Id.). He was board certified by the American Board of Psychiatry and Neurology in 1992. (Gov't Ex. 2). He has conducted two-hundred to three-hundred competency examinations and has been qualified as an expert witness in court approximately one hundred times and for depositions another one hundred to one-hundred fifty times. (Tr. at 41).

On June 14, 2011, Defendant arrived on his own, at Dr. Hilton's medical office, and Dr. Hilton examined Defendant for approximately three hours, which is the routine amount of time for a competency examination. (Tr. at 42). He had sufficient time to conduct the examination of Defendant. (Tr. at 43). Dr. Hilton reported that Defendant

AO 72A
(Rev.8/82)

was "a little guarded, marginally responsive, frequently refusing to talk on certain subjects" during the interview, but that his level of cooperation increased during the interview.[4]  (Tr. at 43).  He had no concerns about Defendant understanding the questions posed.  Defendant's responses were not disordered - he did not display thought disorder.  Although he observed "some circumstantial speech" and "a little bit of distractibility," Defendant was able to interact and communicate.  (Tr. at 44-45).  Dr. Hilton found Defendant's intelligence to be within the average range.  (Tr. at 52).

Defendant has no problem understanding the charges and stated to Dr. Hilton that he was innocent and that someone was lying.  He also understands the criminal proceedings.  (Tr. at 46).  Dr. Hilton did not observe paranoia.  Although Defendant stated that the prosecutor was "out to get them," Dr. Hilton found that belief understandable.  (Tr. at 46).  Defendant stated that his attorney was also but explained why he thought so, that is, because the attorney would not listen to him.  Defendant stated that if the attorney would listen to me, he would speak to him.  (Tr. at 47).  Defendant did express fears about the attorney being black and that he might need an attorney that was not black.  Dr. Hilton did not find that Defendant's concerns, as a

---

[4]Dr. Hilton agreed that Defendant "picks and chooses" the information to disclose and that he "can be stubborn and resistant and evasive at times" in that he decides who gets certain information.  (Tr. at 60).

8

black person, of racial prejudice in the South were delusional. (Tr. at 47, 52). He stated that if a person is "frankly paranoid or delusional and usually when they are they're out of touch with reality[, . . .] they have a very hard time functioning in society." (Tr. at 47). Instead, he found Defendant to be suspicious. (Tr. at 48).

Dr. Hilton also found that Defendant understood the consequences of the proceedings. Defendant acknowledged that if convicted he could go to jail and that he was worried and anxious, which was normal, about the situation he was facing. (Tr. at 48, 53). Defendant did mention that he had connections with people who could help him, and, if true, Dr. Hilton said that these beliefs were not unreasonable. (Tr. at 48, 52). These beliefs were not grandiose but "naive." (Tr. at 48). With respect to assisting his attorney, Dr. Hilton found that Defendant could do so. As noted, Defendant reported that, if his attorney would listen to him, he would talk to him. (Tr. at 50). From reviewing the report of Dr. Bhandari, Dr. Hilton felt that Defendant was being naive about what the legal system required the attorney to do, that is, Defendant thought that the attorney should meet with him everyday or mentor him, but he concluded that Defendant was not delusional. (Tr. at 50-51).

Dr. Hilton saw no benefit to administering the MMPI test in a criminal setting. And he did not agree that it was a "simple" test. The test has 567 questions and is a

9

one to one and one-half hour "ordeal" that includes some complicated questions and questions with double negatives. (Tr. at 52-53). People with no problems "grow tired" and become non-cooperative taking the test which has little to do with competency. (Tr. at 53).

Dr. Hilton determined that Defendant is not suffering from a mental disease or defect, and that while Defendant might have suffered from a learning disability or attention deficit problems as a child, he does not suffer from "psychotic conditions, mood disorders, [or] anxiety disorders[.]" (Tr. at 51). He concluded, in his "opinion to a reasonable degree of medical certainty[,] that Mr. Smith is not suffering from a mental disease or defect and further, that he understands the nature and consequences of the proceedings against him and is able to assist properly in his defense[;] . . . therefore my opinion to a reasonable degree of medical certainty [is] that Mr. Smith is competent to stand trial." (Tr. at 51; Gov't Ex. B).

On cross-examination, Dr. Hilton was asked if the amount of time spent on a competency examination impacted his opinion. He responded that more time did not equate with having better or more pertinent information about the issue of competency. (Tr. at 55). Also, the information provided by Defendant's mother and grandmother did not appear pertinent, implying that the vagueness of the information was not

helpful.[5]  (Tr. at 56).  Dr. Hilton agreed that if Defendant's beliefs about his connections to famous people were false and fixed, which Dr. Hilton did not know if true or not, then those beliefs could be delusional.  And at some point, he agreed that beliefs about racial prejudice could be a delusion and be a barrier to assisting his attorney.  (Tr. at 57-58).  He also agreed that his findings of marginal responses, being at times uncooperative and refusal to answer questions could be symptoms of paranoia.  (Tr. at 58).

Additional facts will be set forth as necessary during discussion of the issue of Defendant's mental competency to stand trial.

## II.    Discussion

Title 18, United States Code, Section 4241(a), provides that the court shall order a hearing regarding a defendant's competency to stand trial "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to

---

[5]On re-direct, Dr. Hilton explained that the information about medications and childhood hospitalization did not indicate that Defendant was placed in a "significant psychiatric hospitalization" as Dr. Bhandari concluded.  There was no indication that this was a lengthy hospitalization, and oftentimes, children with behavioral issues are hospitalized for short time frames.  If Defendant had a "major issue," treatment would take a long time.  (Tr. at 60-61).

AO 72A
(Rev.8/82)

understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). As provided for by § 4241(b), the District Court ordered a psychiatric evaluation prior to conducting the hearing. [Doc. 112]. This court then granted the Government's request for a separate examination. [Doc. 125]. Following the examinations, the court received the reports of the forensic psychiatrists (Gov't Ex. B; Def. Ex. 1) pursuant to § 4247(c), which as required, included Defendant's history and present symptoms, a description of the tests that were employed and the results of those tests, the examiners' findings, and the examiners' opinions as to diagnosis and as to "whether [Defendant] is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4147(c).

Following the evaluations, the proceedings are governed by §§ 4241(c) and (d), which provide for a hearing to be conducted for the court to determine whether, "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist

properly in his defense . . . ." 18 U.S.C. §§ 4241(c), (d).  That hearing was conducted on September 8, 2011.  [Doc. 133].

"The Due Process Clause of the Fifth Amendment prohibits the government from trying a defendant who is incompetent."  United States v. Rahim, 431 F.3d 753, 759 (11th Cir. 2005).  The test for determining competency to stand trial is "whether [Defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him."  Dusky v. United States, 80 S. Ct. 788, 789 (1960) (citations and internal quotation marks omitted).  "Whether the defendant is competent is an ongoing inquiry; the defendant must be competent at all stages of trial."  Rahim, 431 F.3d at 759.  "'[A defendant] raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence[.]'"  United States v. Bradley, 644 F.3d 1213, 1268 (11th Cir. 2011) (citation omitted); accord Battle v. United States, 419 F.3d 1292, 1298 (11th Cir. 2005).

"'[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.' . . . Similarly, neither low intelligence, mental deficiency, nor

13

bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (citation omitted); see also Battle, 419 F.3d at 1299 (finding that Battle's "courtroom outbursts, odd behavior, and history of mental illness" did not "mandate a finding of incompetency"); Wright v. Secretary for the Department of Corrections, 278 F.3d 1245, 1259 (11th Cir. 2002). Quite often the best evidence of a defendant's competence to stand trial is the evidence of his or her behavior during the relevant time period, "especially the evidence of how he [or she] related to and communicated with others. . . ." Wright, 278 F.3d at 1259; see United States v. Martinez, 446 F.3d 878, 880 (8th Cir. 2006) ("In determining the defendant's competency, the district court may consider numerous factors, including . . . the court's observation of the defendant's demeanor.") (citations and internal quotation marks omitted); Battle, 419 F.3d at 1300 (noting that the trial court had "observed and interacted with Battle throughout the trial and found Battle's responses to the court and his decisions to be rational").

In this case, the court received the reports and testimony of two qualified experts in the field of forensic psychiatry - one finding that Defendant was not competent to stand trial and one finding that Defendant was competent. After consideration of all of the evidence, including this court's observation of Defendant during the competency

14

hearing, and for the reasons cited *infra*, the court credits the findings of Dr. Hilton and concludes that Defendant is competent to stand trial.[6] See Bradley, 644 F.3d at 1268 ("[F]aced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion.") (citations and internal quotation marks omitted).

With respect to the court's observations of Defendant, of which the court made note throughout the hearing, the court observed Defendant to be sitting quietly and appearing attentive. He was not, despite Dr. Bhandari's concerns (Tr. at 18-19), disruptive or distracted. On only two occasions, one noted in the record (Tr. at 57), did Defendant seek the attention of the court by raising his hand. At which time, counsel

---

[6]The court does not find persuasive Defendant's arguments that the additional time that Dr. Bhandari and her staff spent with him lends more credibility to her opinion. [Doc. 5-8]. At best, Dr. Bhandari spent one more hour with Defendant in the interview process than did Dr. Hilton. (Tr. at 10, 19-20, 22; Def. Ex. 1). And, although her staff also spent ninety minutes with Defendant, Defendant was primarily engaged in taking the MMPI test during that time, which the court finds was not pertinent to the determination of Defendant's competency to stand trial because Defendant left a substantial portion of the test incomplete and it could not be scored. (Tr. at 19-21; Def. Ex. 1). Furthermore, Dr. Hilton comes to court with substantially more experience in the field of forensic psychiatry, in conducting competency examinations and in being qualified as an expert on this subject than Dr. Bhandari. (Tr. at 5-7, 49-41; Gov't Ex. A; Def. Ex. 2). With that experience, the court believes Dr. Hilton has a better basis for distinguishing between a defendant who is or who is not paranoid, delusional or grandiose in his thinking.

15

briefly consulted with Defendant and then requested and was granted a brief recess (id.). The court did not note any antagonism between Defendant and his attorney.

Dr. Hilton also clearly and persuasively explained the basis of his conclusions that Defendant understood the nature of the charges, the court proceedings, and the potential consequences facing him due to the charges and of his conclusion that Defendant was able to assist his attorney. (Tr. at 43-46, 48-52). Dr. Bhandari agrees that Defendant did understand the charges and the criminal proceedings. (Tr. at 14, 29-30). Frankly, the disagreement over Defendant's understanding of the nature of the consequences facing him and his ability to assist his attorney appear to be one of degree or in how Defendant's conduct and beliefs are interpreted. With respect to his finding that Defendant understood the consequences of the proceedings, Dr. Hilton noted that Defendant acknowledged that if convicted he could go to jail and that he was worried and anxious, which was normal, about the situation he was facing. (Tr. at 48, 53). Although Defendant mentioned that he had connections with people who could help him, Dr. Hilton said that, if true - which Dr. Hilton could not determine - nor for that matter can the court, these beliefs were not unreasonable. (Tr. at 48, 52). According to Dr. Hilton, these beliefs were not grandiose but "naive." (Tr. at 48). Dr. Bhandari partially relied in her decision that Defendant did not understand and would

16

not discuss the consequences of the charges on his fixation with his innocence. (Tr. at 13-15). However, being fixated on innocence is a trait of a great many criminal defendants and often is held to their detriment. Nonetheless, all of those defendants are not incompetent to stand trial because they make bad decisions given the refusal to discuss a possible finding of guilt.

Dr. Hilton did not observe paranoia regarding Defendant's relationship with his attorney or an inability to consult with his attorney in order to assist in his defense. Although Defendant stated that the prosecutor was "out to get them," Dr. Hilton found that belief understandable. (Tr. at 46). Defendant stated that his attorney was also, but he explained why he thought so, that is, because the attorney would not listen to him. Defendant stated that if the attorney "would listen to me than I would talk to him." (Tr. at 47). From reviewing the report of Dr. Bhandari, Dr. Hilton felt that Defendant was being naive about what the legal system required the attorney to do, that is, thinking that the attorney should meet with Defendant everyday or mentor him, but he concluded that Defendant was not delusional. (Tr. at 50-51). Again, quite a number of defendants express displeasure and distrust of appointed counsel due to lack of communication or from communication of information (such as recommendations to plead guilty) that those defendants do not want to hear, and, again, all of those

defendants are not incompetent. While Defendant expressed fears about the attorney being black and that he might need an attorney that was not black, Dr. Hilton did not find that Defendant's concerns, as a black person in the South, of racial prejudice were delusional. (Tr. at 47, 52).

In support of his position that his paranoia about his attorney and the impact on his ability to assist his attorney in his defense should result in a finding of incompetency, Defendant relies on the finding of incompetency in <u>United States v. Jackon</u>, 2010 WL 2104024 (N.D. Ga. April 26, 2010).[7] In <u>Jackson</u>, the report of the defendant's mental competency examination included, among others, findings that the defendant "was 'distracted by reported visual hallucinations and persecutory delusions[,]'" that his "speech was illogical, incoherent, irrelevant, and he spoke quickly and loudly[,]" that he also reported auditory hallucinations, that he had been "on antipsychotic medications," and that he was diagnosed with "'Psychotic Disorder,

---

[7]This Report and Recommendation of Magistrate Judge Linda Walker was entered based on the uncontested report that Defendant was incompetent to stand trial, 2010 WL 2104024, at **2-3, and was subsequently adopted, without objection, by District Court Judge Thomas Thrash [1:09-CR-237-TWT-LTW, Doc. 55, May 20, 2010].

18

AO 72A
(Rev.8/82)

not Otherwise Specified[.]"[8] Id., at *2. Based on that defendant's mental and medical history, along with the competency examination report, an unopposed finding of incompetency was made with which the Magistrate Judge agreed. Id., at **4-5. The facts in Jackson, particularly with respect to that defendant's mental history and conduct, are inapposite to those under consideration in this case.

Additionally, disagreements with, antagonism towards or refusal to follow advice from counsel does not equate with a finding that a defendant is incompetent to stand trial. See Bradley, 644 F.3d at 1269-70 (finding "that a client and his lawyer clash, or that the client does not always follow the lawyer's advice, does not mean that the client is incompetent to stand trial[,]" and, similarly, that a defendant "had trouble obeying his attorney's commands and often confused events does not render him incompetent"); Battle, 419 F.3d at 1299 (finding that defendant "at times exhibited an antagonistic relationship with his lawyers over their representation of him is no indicator of incompetency"). The issue is whether Defendant "had the ability to, and did indeed, assist his counsel in preparing for his trial by discussing the facts of his

---

[8]During incarceration, the defendant was observed walking around the unit naked complaining that there was a lion in his cell; he refused to eat a number of meals in a row contending that there were snakes in his food; and he reported that two people were attempting to kill him. Id., at *4.

case in detail before trial and by cooperating with defense investigators." <u>Battle</u>, 419 F.3d at 1300. The record before the court does not establish that Defendant *lacks* the ability to assist counsel. In fact, Dr. Bhandari did not conclude that Defendant was incapable of assisting counsel. She stated, "I felt like the delusions, the distractibility, the disinhibition, his fixation on certain ideas, were defects that *made it difficult* for him to be able to assist his attorney and to participate in his defense." (Tr. at 24) (emphasis added). And, while she also concluded these traits "would seriously impact his ability to work with his attorney on his various options" and would "impede his ability to rationally discuss his options" (Tr. at 16-18), the court does not credit the conclusions that she drew from her interactions with Defendant, especially in light of Dr. Hilton's well-reasoned conclusions to the contrary.

Finally, despite the fact that Defendant's conduct may evidence some symptoms of paranoia, neither witness diagnosed Defendant with any mental disease or defect. (Tr. at 31-35, 37, 51, 58). The court agrees with Dr. Hilton's statement that if a person is "frankly paranoid or delusional and usually when they are they're out of touch with reality[, . . .] they have a very hard time functioning in society." (Tr. at 47). Defendant has been and is functioning in society. Defendant has been out on bond since April 7,

AO 72A
(Rev.8/82)

2010 [Docs. 27, 28], has apparently complied with the conditions of his bond,[9] and has had, at least as far as the record before the court evidences, no difficulty in his daily activities. In fact, Dr. Bhandari and Dr. Hilton both found that, based on their observations of Defendant, his cognitive function was "average for his age group," that is, early twenties. (Tr. at 26-27, 52).

For all of these reasons, the court finds that Defendant has failed to establish by a preponderance of the evidence that he lacks a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and [that] he [lacks] a rational as well as factual understanding of the proceedings against him." Dusky, 80 S. Ct. at 789.

## III. Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant be found competent to stand trial.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

---

[9]In fact, in July 2010, Defendant's conditions of bond were modified to allow him a later curfew so that he could attend night classes at the American Intercontinental University. [Docs. 53, 54].

AO 72A
(Rev.8/82)

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 13th day of December, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)